UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED OF AMERICA

v.                                           CASE No. 8:09-CR-572-T-30TGW

JAMES JACKSON MACK

---

## O R D E R

THIS CAUSE came on to be heard upon the Government's Motion for a Hearing Regarding Potential Conflict of Interest (Doc. 79). The Government alleged that the defendant's legal fees were being paid by a drug trafficking organization, which created for defense attorney Michael O. Donaldson a conflict of interest that warranted his disqualification from the case.

After an evidentiary hearing on this matter, I determined that the Camon drug trafficking organization, of which the defendant was allegedly a member, paid at least a portion of the defendant's legal fees in an effort to gain defense counsel's assistance in dissuading the defendant from cooperating with the Government. This circumstance renders defense counsel

ineffective and interferes with the administration of justice. I therefore disqualified attorney Michael O. Donaldson from representing the defendant in this matter, and reappointed the Federal Public Defender's Office as defense counsel. This Order explains the reasons for my decision.

I.

It is alleged in the criminal complaint that, on December 10, 2009, defendant James Jackson Mack ("the defendant") and co-defendant Ian Thomas arrived with a confidential source at the Sarasota Police Department controlled undercover warehouse in Sarasota, Florida, to purchase several kilograms of cocaine (Doc. 1). After the defendant entered the warehouse, an undercover officer allegedly observed him remove from a hidden compartment in his vehicle plastic bags containing large amounts of currency. In response, the undercover officer presented to the defendant a bag containing seven kilograms of cocaine. After the defendant allegedly cut into one of the kilograms and inspected it, he was taken into custody. A handgun was allegedly found in the same vehicle compartment where the defendant retrieved the money.

The defendant was subsequently indicted for participating in a conspiracy with the intent to distribute five kilograms or more of a substance containing cocaine, and possession of a firearm in furtherance of a drug trafficking crime (Doc. 11). The defendant has two previous drug convictions in state courts (Doc. 29) and, consequently, he is facing a mandatory life sentence if convicted of the drug offense (see Doc. 79, p. 3, n.4).

When the defendant was arrested, he completed a financial affidavit, upon which he was found financially unable to employ counsel (Doc. 5). Consequently, the Federal Public Defender was appointed as his attorney (Doc. 6). However, several days later, attorney Michael O. Donaldson, from Orlando, was retained privately as the defendant's attorney (Doc. 10).[1]

The Government filed this Motion for a Hearing Regarding Potential Conflict of Interest (Doc. 79) to address the source of the funds for the defendant's legal representation. It alleged that at least a portion of Donaldson's fee is being paid by associates of the illegal drug organization of which the defendant is a member (id., pp. 1-2). The Government

---

[1]Additionally, attorney Norman S. Cannella, Sr., filed a notice of appearance on the defendant's behalf, but he subsequently withdrew from the case (Docs. 28, 66, 67).

contended that such a circumstance may present a "direct and clear conflict with the Defendant's interests" because the drug organization "may have an interest in ensuring that [the defendant] does not cooperate and provide information against them" (id., p. 5). A hearing on the matter, originally set for June 2010, was continued until August 4, 2010, in order to permit an ongoing criminal investigation to progress (Docs. 80, 83).

At the hearing, the Government presented testimony from two law enforcement officers and offered several exhibits (see Doc. 101, Gvt. Exs. 1-6). Additionally, the defendant testified on his own behalf (see Doc. 101). Defense counsel Donaldson also answered questions, although not under oath (id., p. 31).[2]

Daniel P. McCaffrey, a special agent with the Tampa district office of the Drug Enforcement Administration (DEA), testified first on the Government's behalf (id., pp. 6-7).   McCaffrey participated in the investigation that led to the defendant's arrest, and testified that he had

---

[2]However. Donaldson was warned at the hearing that there could be serious consequences from the Florida Bar and this court if he was making untruthful statements to the court (see Doc. 101, p. 31). He responded that he was very much aware of that (id.). Donaldson was subsequently told severe sanctions could be imposed against him (id., p. 38).

reviewed the defendant's telephone calls from the Pinellas County Jail, during which the defendant's legal representation was discussed (see id., pp. 7-8).

During a telephone call on December 11, 2009, the defendant requested that "kinfolk" be told that he is in jail and to send him a "mouthpiece," *i.e.*, an attorney (id., p. 8).  The defendant was subsequently advised that "the folk got you a mouthpiece," and identified the lawyer as "Mike Donaldson" from Orlando (id., pp. 11-12).  The defendant stated that he had spoken with him, and that the attorney is "down with Buddy and them folks" (id., pp. 12-13).

On December 14, 2009, the defendant was told that the lawyer had called kinfolk and "asked if ... [he] was the lawyer he wanted to roll with" (id., p. 13).  The defendant responded, "If they're confident, I'm confident" (id., pp. 13-14).  After completing the telephone call, the recorder captured the defendant saying, "Ike says it's okay to go with him" (id., p. 15).

McCaffrey testified that he was familiar with the name "Ike" from the investigation which culminated in the indictment in this case (id.).  Thus, McCaffrey stated that, during a meeting regarding a cocaine purchase that was attended by the defendant, a co-defendant, and the confidential

source, they made reference during a telephone call to individuals they worked for and brought up the name "Ike" (id., pp. 15-16).

On December 21, 2009, the defendant had a conversation with the Federal Public Defender's Office, during which he was asked who hired attorney Donaldson. The defendant stated that he didn't know Donaldson, or who hired him, but that "Buddy and them" sent Donaldson (id., pp. 17, 18). It was stated in another telephone call that the representation cost "15 big dollars," which McCaffrey interpreted as $15,000 (id., p. 18).

In response to the Government's proffer, I asked Donaldson who was paying the defendant's legal fees. Donaldson stated that "[t]he fees are paid by [the defendant's] family members, Judge" (id., p. 30). When I asked him to identify those family members, he specified the defendant's niece and aunt (id.).

However, when I probed further and asked Donaldson if he has ever been paid by someone who is not a family member, Donaldson stated, "I don't know of any" and "I don't know them" (id., p. 31). Donaldson stated vaguely that there are "people" he has spoken to about the defendant's case who help pay the defendant's legal fees (id.). Donaldson added,

however, that "I don't know these people..... I have no idea who they are, Judge" (id., pp. 31-32).

After I expressed concern over the vagueness of strangers calling about the defendant and contributing money to his defense, Donaldson stated that, "[m]aybe one person called" (id., p. 37). When asked about that person's identity, Donaldson said, "[a] person Mr. Mack provided me information," before he was interrupted by the defendant stating that the largest part of his legal fee is being paid by his uncle, Vernell Woody, who purportedly won $776,000 playing a scratch-off lottery game (id., pp. 37-38).[3]

Because the defendant's interjection was not under oath, I advised Donaldson that, if he wanted me to consider the remark, the defendant needed to testify under oath, which he did (id., pp. 38-39). The defendant testified that the "bigger" amount came from his uncle and that family members are also getting up the money (id., p. 40). The defendant was then cross-examined by the Government. He was asked if he knew "Danielle Jones" or "Issac Camon" (id., pp. 44-45). The defendant stated that Jones is a friend from Georgia (id. at p. 44). In response to the Government's query,

_____

[3]On cross-examination, the defendant stated that he does not know his uncle's address or telephone number, but that the uncle stays in Miami (Doc. 101, p. 43).

"how much of your attorneys fees have you negotiated for Danielle Jones to pay for you?" the defendant stated, "I don't know" (id., p. 45).

The defendant also acknowledged that he knows Isaac Camon from Georgia, but denied that he is a friend. (id.). In this regard, the defendant stated that "I don't associate with Ike like that. I'm not part of a drug organization" (id.). Further, the defendant denied that he had authorized Donaldson to speak with Camon about his case, or for Camon to pay his attorney's fees  (id., p. 46).

In response to this testimony, the Government called Rob Picciotti from the Lowndes County Sheriff's Department in Georgia. Picciotti is a member of a Federal Bureau of Investigation (FBI) task force that investigated an alleged cocaine trafficking organization in Georgia (id., pp. 48, 49). Picciotti testified that, during the investigation, Isaac Camon was identified as the head of the Camon drug trafficking organization, which operated from Lakeland, Georgia (id., p. 49).

Piccotti testified that, during the FBI's investigation of Camon and his associates, they conducted surveillance on a woman named Danielle Jones, a suspected money courier for the organization (see id.). On April 30,

2010, Picciotti stopped Jones's vehicle because he suspected that she was carrying funds (id., p. 50). Jones, who had been at Camon's home prior to the traffic stop, had approximately $4,000 in cash (id., pp. 50, 51). She told Picciotti that she was driving one hour away to a Wachovia bank to deposit the money in the bank account of attorney Mike Donaldson in Florida (id., pp. 51-53).

Jones stated that Donaldson was not her attorney (id., p. 52). Further, she did not know why she was making this deposit (see id.). Additionally, deposit slips in Jones's purse reflected two other deposits of $4,000 each into Donaldson's law firm's bank account in February and March 2010 (see id., pp. 53-55; Gvt. Exs. 5, 6).

Picciotti testified further that a wire intercept on Camon's telephone number revealed conversations between Donaldson and Camon, during which they discussed the defendant's case and payment of the defendant's legal fees (Doc. 101, pp. 56-57; Gvt. Exs. 2, 4). Thus, Picciotti, reading from a transcript of an intercepted call between Camon and Donaldson on March 25, 2010, recounted the following discussion (see Doc. 101, pp. 58, 60-61; Gvt Ex. 2, pp. 19-20)(emphasis added):

D[onaldson]: ....I want you to know I don't like the stress the situation or whatever. Here's what we gotta do. I'm gonna have to pack up my office on the 19th, well actually 19th or 18th, I'm gonna have to take my investigator with me, my paralegal. We're going to have to go to Tampa and camp out for a week, at least, because right now the trial's scheduled from the 19th to the 23rd. That's where they've got it right now. Uh, if it goes beyond that, we've got to roll. We're got to roll if it goes shorter. We've got to roll whatever it is, but **I'm gonna try to see if you can talk to who we need to see, if you can make something decent happen for me, man, you know what I'm saying, because I've got to pretty much close my operations.**

C[amon]: I will.

Picciotti testified that, although the term money was not mentioned, based on his experience, they were discussing payment for defendant's legal defense (Doc. 101, p. 61).

Further, Camon and Donaldson discussed during that telephone conversation the status of the case against co-defendant Ian Thomas, who is referred to as "number two" (id., p. 61; see Gvt. Ex. 2, pp. 9-12). There was concern that Thomas may cooperate with the Government, and Camon asked, "Do you think number two is, uh, like ... back rock solid now?" (Doc. 101, pp. 61, 62, 66; see Gvt. Ex. 2, pp. 9-12). Donaldson replied, "[y]eah, yeah,

he solid now. He is solid" (Doc. 101, p. 62). Donaldson continued, telling

Camon what he had said to Thomas, who has his own attorney (id., pp. 64-65;

see Gvt. Ex. 2, p. 12)(emphasis added):

> we ha[d] a little meeting, and I spoke to him, and I
> was saying the whole thing you was saying, you
> know, like how ... you know, be the one that cause
> this mess practically, and then you gonna roll out
> this. You know, I mean, how you –really, what I'm
> saying to him is, how you think? **How much of a**
> **life you think you're going to have when you get**
> **back on the street? So, if your conscience don't**
> **tap you in the head, somebody–somebody**
> **definitely gonna to do that.**

Camon responded, "Right" (Doc. 101, p. 65). Picciotti testified that, from his

experience, this conversation referred to convincing co-defendant Thomas not

to cooperate with the Government in this case (id., p. 66).

Picciotti testified that Camon and Donaldson also discussed the

defendant's case and payment of his legal fees during a telephone

conversation on April 1, 2010 (id., pp. 66, 67).[4] Thus, while discussing the

hiring of an additional attorney for the defendant, Camon stated that, instead

---

[4]Although they did not identify themselves during this telephone call, Picciotti
testified, without contradiction, that the participants on both calls were Donaldson and
Camon (Doc. 101, p. 57).

of hiring another attorney, "I just want to continue to get the funds you need" (Doc. 101, pp. 67-68; Gvt. Ex. 4, p. 9).

Attorney Donaldson then recalled the defendant to testify. The defendant stated that he had not mentioned to Donaldson the name Camon or Ike, but that he had authorized Donaldson to speak about his case with "Forty" (Doc. 101, p. 71). On cross-examination, the defendant acknowledged that "Forty" is Camon's brother (id., p. 75). The defendant testified that he had told Donaldson to get in touch with "Forty" because "Forty" knows "the people who to get in touch with" (id.). When the Government suggested that Isaac Camon was the person the defendant intended that "Forty" contact, the defendant responded, "You wrong. I was an independent operator, sir. I don't work for nobody" (id., pp. 75-76).

After presentation of the evidence, the Government reiterated that Donaldson should be disqualified (id., p. 76). Donaldson argued that no conflict exists, and that he did not violate any ethics rules, because he thought he had been speaking with a family member, and that the defendant's legal fees were being paid by the defendant's family (id., pp. 77, 78). However,

Donaldson did not deny he was a participant on the two wire-tapped telephone calls, or the substance of those conversations.

It was clear by the end of the hearing that disqualification was warranted. Initially, my view of the situation, and my inquiry of Donaldson, was constrained because, although I was aware of the wire-tap information, which had been filed ex parte under seal, I did not know whether that investigation was continuing. However, the Government's subsequent presentation of the wire-tap evidence, as well as the evidence regarding Jones's transporting funds to Donaldson, required Donaldson to be disqualified to uphold the integrity of the criminal justice system.[5]

## II.

It is recognized that "a criminal defendant has a presumptive right to counsel of choice ... and courts should hesitate to disqualify defense counsel." U.S. v. Ross, 33 F.3d 1507, 1522-23 (11th Cir. 1994), cert. denied, 515 U.S. 1132 (1992)(citation omitted). Thus, the Sixth Amendment guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the

---

[5]Notably, I reappointed as defense counsel the Federal Public Defender's Office (Doc. 101, p. 79). I told the defendant that he could retain another private attorney if he wished to do so, provided the money for the attorney did not come from the drug organization (id., pp. 78-79).

right ... to have the Assistance of Counsel for his defence," and the accused's ability to select the counsel of his choice is considered part of that right. Id. at 1522 (citing Powell v. Alabama, 287 U.S. 45, 53 (1932)).

However, that right is not absolute, and the presumption in favor of the accused's chosen counsel "may be overcome ... by a demonstration of actual conflict ... [or] a serious potential for conflict." Wheat v. U.S., 486 U.S. 153, 164 (1988). Thus, "while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Id. at 159.

Furthermore, "[t]he question of disqualification...implicates not only the Sixth Amendment right of the accused, but also the interests of the courts in preserving the integrity of the process and the government's interests in ensuring a just verdict and a fair trial." U.S. v. Locascio, 6 F.3d 924, 931 (2nd Cir. 1993), cert. denied, 511 U.S. 1070 (1994). Consequently, although a criminal defendant can proffer a waiver of his Sixth Amendment right to conflict-free counsel, a court may reject that waiver if necessary to "ensur[e]

that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Wheat v. U.S., supra, 486 U.S. at 162; see also U.S. v. Ross, supra, 33 F.3d at 1523.

III.

As indicated, the Government argues that Donaldson has an actual or potential conflict of interest that requires his disqualification because a drug trafficking organization is allegedly paying the defendant's legal fees and interfering with the defense of this case (Doc. 79). There was strong evidence at the hearing that the Camon drug trafficking organization, led by Isaac Camon, was paying for the defendant's legal representation.[6]

In this regard, the Government presented evidence that Danielle Jones, a suspected money courier with the Camon drug organization, was depositing thousands of dollars into Donaldson's bank account. Thus, Jones had in her possession during a traffic stop in April 2010 approximately $4,000 in cash that she intended to deposit into Donaldson's account (Doc. 101, pp. 50-52). Jones stated that Donaldson was not her attorney, and she

---

[6]It is noted that the defendant and his counsel did not controvert Piccotti's testimony that there is a Camon drug organization, or that Isaac Camon is its leader.

did not know why she was making the deposit (see id., pp. 52-54).
Particularly in the absence of any other explanation, the obvious conclusion
is that Jones, who had been at Camon's house before the traffic stop, was
given the money by Camon, and directed by Camon to deposit the funds into
Donaldson's account to pay for the defendant's legal representation. This
conclusion is supported further by the discovery of deposit slips in Jones's
purse reflecting two other deposits of $4,000 each into Donaldson's bank in
previous months (id., pp. 53-55; Gvt. Exs. 5, 6). Camon, moreover, confirmed
that the drug organization was paying the defendant's legal fees when he
stated during a telephone conversation with Donaldson, "I just want to
continue to get you the funds you need" (Gvt. Ex. 4, p. 9).

The impropriety, and the risk of conflict, created by the drug
organization paying for the defendant's fees is clear. Thus, the Supreme
Court recognized in Wood v. Georgia, 450 U.S. 261, 268-69 (1981):

> [I]nherent dangers ... arise when a criminal
> defendant is represented by a lawyer hired and paid
> by a third party, particularly when the third party is
> the operator of the alleged criminal enterprise. One
> risk is that the lawyer will prevent his client from
> obtaining leniency by preventing the client from
> offering testimony against [the alleged criminal

enterprise] or from taking other actions contrary to the [enterprise's] interests.

Such a conflict is not hypothetical in this case. Thus, the recorded telephone conversations between Donaldson and Camon reveal the drug organization's interest in dissuading the defendants from cooperating with the Government, apparently so that the defendants do not implicate anyone else in the organization in criminal activity.

The Camon drug organization's interest in discouraging the defendants' cooperation is exemplified in the March 25, 2010, telephone conversation between Donaldson and Camon, in which Camon asked Donaldson, "[d]o you think number two [the co-defendant Thomas] is, uh, like ... back rock solid now?" (Doc. 101, p. 66; <u>see</u> Gvt. Ex. 2, pp. 9-12). Donaldson replied, "yeah, yeah, he solid now. He is solid" (Doc. 101, p. 65; <u>see</u> Gvt. Ex. 2, p. 9). Donaldson added that he told co-defendant Thomas that he "don't need to be the one up there that's trying to testify against nobody" (Gvt. Ex. 2, p. 10), saying (Doc. 101, p. 65; <u>see</u> Gvt. Ex. 2, p. 12):

> [h]ow much of a life you think you're going to have when you get back on the street? So, if your conscience don't tap you in the head, somebody–somebody definitely gonna to do that."

Picciotti testified that, from his experience, this conversation referred to co-defendant Thomas cooperating with the Government in this case (Doc. 101, p. 66). Moreover, when Donaldson indicated to Camon that, if Thomas testified against others, he would not be "okay" at home in Jamaica because "people down there just don't work like that," Camon responded, "We don't work like that (Laughter)" (Gvt. Ex. 2, p. 12).

Camon clearly has a desire that the defendants not cooperate with the Government. Moreover, the wire-tapped conversations demonstrate that Donaldson is complicit with Camon in discouraging the defendants from cooperating with the Government.

Unquestionably, Donaldson's advancement of the drug organization's interests conflicts with his client's interests. Among other problems, it impedes due consideration of a plea agreement, which is an especially significant consideration in this case because the defendant is facing a mandatory life sentence if he is convicted, and Donaldson himself stated that the defendant was "caught red-handed in the warehouse, on the video" (Gvt. Ex. 2, p. 4).[7]

---

[7] Further, according to Donaldson, former co-counsel Cannella allegedly recommended that the defendant enter a plea agreement (Gvt. Ex. 4, p. 5).

The Government stated that it offered the defendant a plea agreement and an opportunity to cooperate, but that it was rejected (Doc. 79, p. 3, n.4). At a minimum, Donaldson lacks the independent judgment to render an unbiased opinion of whether a plea agreement is in the defendant's best interests because Donaldson's loyalty is to the drug organization and its interest in dissuading the defendant from cooperating with the Government. See Quintero v. U.S., 33 F.3d 1133, 1136 (9th Cir. 1994)("[I]n a case of ... conflicting interests the evil is in what the advocate finds himself compelled to refrain from doing, not only at trial but also as to pretrial plea negotiations."). Consequently, because Donaldson has "divided loyalties that prevent him from effectively representing the defendant," his disqualification from this case is appropriate. U.S. v. Ross, supra, 33 F.3d at 1523.

### IV.

Although it is acknowledged that defendants may waive their Sixth Amendment right to conflict-free counsel, a trial court may refuse to accept the waiver in order to insure the proper administration of justice and maintain the integrity of the court. See, e.g., Wheat v. U.S., supra, 486 U.S.

at 164; U.S. v. Ross, supra, 33 F.3d at 1524.  As the Supreme Court

articulated in Wheat v. U.S., supra, 486 U.S. at 160:

> Federal courts have an independent interest in
> ensuring that criminal trials are conducted within
> the ethical standards of the profession and that
> legal proceedings appear fair to all who observe
> them. ... Not only the interest of a criminal
> defendant but the institutional interest in the
> rendition of just verdicts in criminal cases may be
> jeopardized by [conflicted] representation.

In particular, the Quintero court summarized the circumstances confronted in

this case (33 F.3d at 1136, n.3):

> If in fact [defense] counsel was paid by a drug
> supplier to assure that the supplier would evade
> prosecution, the injustice is manifest.  Not only
> w[ould] the [defendant be] deprived of an attorney
> whose allegiance was solely to him, but, just as
> important, the court [would] be[] prevented by
> trickery from making certain that justice was
> accomplished. Justice and the Constitution cannot
> permit such a fraud upon the court or the litigants
> before it.

Under the circumstances, I summarily rejected any idea of a

waiver of conflict-free counsel in this case (Doc. 101, p. 78).  I felt that it

would be irresponsible on my part to accept such a waiver even if the

defendant was foolish enough to give up that right in the face of a virtually

certain mandatory life sentence.  In my view, a fair and just criminal law system could not tolerate such a result.

Significantly, this is not a case where the drug organization is simply paying the attorney's fee.  Rather, as previously shown, it involves a lawyer who is advancing the organization's interest over that of his putative client.  Moreover, in connection with the inquiry into the payment of fees, the lawyer was untruthful.

At the hearing, Donaldson stated initially that the defendant's legal fees were being paid by family members, and that he "do[es]n't know of any other information that [he] can provide this Court" (id., pp. 30, 36).  After my further probing, Donaldson stated vaguely that the defendant's "friends" contributed toward the defendant's legal fees (id., p. 33).  When I asked the identities of these friends, Donaldson represented to the court that "I don't know these people ... I have no idea who they are, Judge" (id., p. 32).

However, the evidence clearly demonstrates that Donaldson was familiar with Camon and knew that Camon was paying the defendant's legal fees. Thus, not only did "Ike" identify himself by name during a telephone conversation, the evidence reflects that Donaldson and Camon had repeated

contact with each other (see Gvt. Exs. 2, 4), and the sensitive nature of their conversations also indicated their familiarity with each other, in stark contrast to Donaldson's representations to this court that he had "no idea" with whom he was speaking (Doc. 101, p. 32).

It is evident, moreover, that Donaldson knew he was receiving funds from Camon to pay for the defendant's legal representation. Thus, Donaldson asked Camon for money for the defendant's legal fees (see Gvt. Ex. 2, pp. 19-20), and Camon expressly confirmed to Donaldson that he is paying the defendant's legal fees when he told Donaldson that he "will continue to get him the funds he needs" (Gvt. Ex. 4, p. 9). Therefore, Donaldson also misled this court when he stated the defendant's legal fees were paid by the defendant's family members.

Thus, counsel's conduct seemingly violates several Rules of Professional Conduct that regulate the members of the Florida Bar, including counsel's duties of loyalty to his client and of candor to the court, as well as his obligation to maintain the integrity of the profession. See, e.g., Rule 4-1.8(f)(a lawyer is precluded from accepting compensation for representing a client from a third party when it interferes with the lawyer's independence of

-22-

professional judgment); Rule 4-3.3(a)(1),(2)( a "lawyer should not knowingly ... make a false statement of fact or law to a tribunal"); Rules 4-8.4(c), (d) (a lawyer shall not engage in conduct involving dishonesty, deceit or misrepresentation, or engage in conduct in connection with the practice of law that is prejudicial to the administration of justice). These circumstances provide a further basis for disqualification. See Wheat v. U.S., supra, 486 U.S. at 160 (federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession).

Therefore, even if the defendant was willing to waive his right to conflict-free representation, in order to ensure that these legal proceedings are conducted within the ethical standards of the profession, and to preserve the integrity of the court, Donaldson was properly disqualified from representing the defendant. See id.; U.S. v. Ross, supra, 33 F.3d at 1523.

For the foregoing reasons, it is therefore,

ORDERED:

That the Government's Motion for a Hearing Regarding Potential Conflict of Interest (Doc. 79) is hereby **GRANTED**, and, for the

reasons stated, defense counsel Michael O. Donaldson is **DISQUALIFIED**

from representing the defendant James Jackson Mack.

DONE AND ORDERED at Tampa, Florida, this 26ᵗʰ day of

August, 2010.

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE